GWIN, District Judge,
dissenting:
Plaintiff-Appellant Barnum Timber Co. (“Barnum”) appeals the district court’s dismissal of its complaint against Defendants-Appellees United States Environmental Protection Agency and Lisa P. Jackson, Administrator of the Environmental Protection Agency (collectively, “EPA”). The district court dismissed the complaint after finding Barnum lacked standing to challenge EPA’s approval of California’s proposed list of environmentally challenged water bodies.
Because I believe that Barnum’s claimed injuries are, at best, conjectural or hypothetical; because I believe there is no causal connection between EPA’s acts and the speculative injuries claimed by Barnum; and because I believe that nothing EPA could do would redress Barnum’s speculative injury, I dissent. As described, any injury that Barnum has suffered — and it is nowhere clear that Barnum has suffered any injury — results from California’s acts and could not be remediated by EPA. For these reasons, I would find that Barnum does not have standing to challenge EPA’s action. Accordingly, I respectfully dissent from the majority opinion and would affirm the ruling of the district court.
I. BACKGROUND
Appellant Barnum is a California limited partnership that owns property in the Redwood Creek watershed in Northwestern California. Barnum challenges the inclusion of Redwood Creek in California’s EPA-approved Section 303(d) list of the Clean Water Act (“CWA”), 33 U.S.C. § 1313(d).
Congress enacted the CWA in 1972, amending earlier federal water pollution laws that had proven ineffective. Pronsolino v. Nastri, 291 F.3d 1123, 1126 (9th Cir.2002). With the 1972 Act, Congress explicitly “recognize[d], preserve[d], and protect[ed] the primary responsibilities and rights of states to prevent, reduce, and eliminate pollution, [and] to plan the development and use ... of land and water resources. . . .” CWA § 101(b), 33 U.S.C. § 1251(b).
The Act adopts different methods to address “point sources” and “nonpoint sources” of pollution. “Point sources of pollution are those where the pollutant flows from a discrete conveyance, such as a pipe or tunnel.” Friends of Pinto Creek v. EPA 504 F.3d 1007, 1011 (9th Cir.2007) (internal quotation omitted). Nonpoint sources of pollution are nondiscrete sources, such as runoff from a farmland or timber harvesting. Id. The Act mandates federal “effluent limitations” for point sources, defined as restrictions of pollutants discharged from point sources, which require “the application of the best practicable control technology currently available....” CWA § 301(b)(1), 33 U.S.C. § 1311(b)(1); see CWA § 502(11), 33 U.S.C. § 1362(11). In contrast, the Act “provides no direct mechanism to control nonpoint source pollution,” instead using the states to regulate nonpoint sources and encouraging states through the “threat and promise of federal grants ... to accomplish this task.” Pronsolino, 291 F.3d at 1126-27 (internal citations omitted).
CWA Section 303 is central to this litigation. CWA Sections 303(a)-(e) allows states to set water quality standards for all waters within their boundaries. 33 U.S.C. *903 § 1313(a)-(c). Under the CWA scheme, each state compiles a list of problematic waters, known as the “Section 303(d) list,” and submits that list to EPA for approval.
Each state must submit its Section 303(d) list with proposed limitations — “total maximum daily load” (“TMDL”) — to EPA every two years. 40 C.F.R. § 130.7(d)(1). EPA then either approves or disapproves the waters identified in the state lists and the TMDL pollution loads established by the states. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2). If EPA approves a state’s Section 303(d) list and the TMDL pollution loads included in the list, the state must incorporate them into its “continuing planning process,” as required under Section 303(e).[1] 33 U.S.C. § 1313(d)(2).
Although Section 303(d) requires states to submit lists and pollution loads based on both point sources and nonpoint sources of pollution, it is the state that chooses if and how to implement a nonpoint source provision of a TMDL. Pronsolino, 291 F.3d at 1128-29. The Act simply provides financial incentives to encourage states to implement state regulations greater than those required under the CWA, such as nonpoint source TMDLs. Id. In other words, nonpoint loading limitations are only enforced under state law. See Natural Resources Defense Council v. EPA, 915 F.2d 1314, 1316 (9th Cir.1990) (“The [Clean Water] Act thus banned only discharges from point sources. The discharge of pollutants from nonpoint sources-for example, the runoff of pesticides from farmlands-was not directly prohibited.”).
In amending the CWA in 1977, Congress recognized that states, not the federal government, would regulate nonpoint sources of pollution. See S.Rep. No. 95-370 at 635, 642-43, 1977 U.S.C.C.A.N. 4326, 4334 (1977) (“Congress made a clear and precise distinction between point sources, which would be subject to direct Federal regulation, and nonpoint sources, control of which was specifically reserved to State and local governments ... ”). Thus, as this court has previously explained, “[t]he upshot of this intricate scheme is that the CWA leaves to the states the responsibility of developing plans to achieve water quality standards if the statutorily-mandated point source controls will not alone suffice, while providing federal funding to aid in the implementation of the state plans.” Pronsolino, 291 F.3d at 1128-29. However, in discussing standing, the majority opinion incorrectly suggests that the EPA, and not California, controls nonpoint water standards.
Redwood Creek first appeared on California’s EPA-approved Section 303(d) list in 1992. In both 2002 and 2006, California submitted Section 303(d) lists to EPA that included Redwood Creek as impaired by both sediment and temperature. The EPA listing does not directly impact any use of Barnum’s property. And in both 2002 and 2006, EPA adopted California’s recommendations and approved California’s listing of Redwood Creek as impaired by sediment and temperature.
On April 16, 2008, Barnum filed a Complaint in the district court for the Northern District of California, alleging that EPA violated the Administrative Proce *904 dure Act, 5 U.S.C. § 706(2)(A), by arbitrarily and capriciously approving a list of impaired waters submitted by California pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d). Barnum claims that it has been injured as a result of EPA approval of California’s Redwood Creek’s Section 303(d) listing because the listing diminishes the value of its lands.
EPA moved to dismiss the complaint for lack of subject matter jurisdiction, saying that Barnum does not have standing to bring this suit. The district court granted the Defendants’ motion to dismiss, ruling that Barnum lacked standing after finding that the alleged injury was not fairly traceable to EPA and would not likely be redressed by a ruling in Barnum’s favor.
On October 17, 2008, Barnum filed a motion for leave to file an amended complaint, attaching a proposed new complaint. In the proposed amended complaint, Barnum again alleged that the listing of Redwood Creek will cause a decrease in the value of its property and also submitted declarations from two licensed professional foresters to support its motion for leave to amend.[2] The district court again concluded that “a broad spectrum of factors, both regulatory and non-regulatory, affect the value of plaintiffs property.” The district court held that the new declarations offered nothing to controvert its earlier conclusion that Barnum “had not even attempted, much less succeeded, to isolate Section 303(d) listing from other factors affecting the value of its property.” The court denied Barnum leave to amend the complaint and entered a final judgment in EPA’s favor. Barnum filed a notice of appeal to this Court on December 15, 2008.
On appeal, Barnum advances two theories in support of its argument that it has standing to challenge EPA’s action. Under both of those theories, Barnum alleges that the 303(d) listing will cause the value of its property to decrease. First, Barnum says that EPA’s approval of Redwood Creek on California’s proposed 303(d) triggered the application of California Forestry Regulation § 898, which in turn imposes analysis and mitigation requirements upon “any portion of a waterbody located within or downstream of the proposed timber operation that is listed as water quality limited under Section 303(d) of the Federal Clean Water Act,” Cal. Code Regs. tit. 14, § 898, that will reduce Barnum’s property value. Under its second theory, Barnum alleges that EPA’s acceptance of California’s listing of Redwood Creek on the 303(d) list directly caused a devaluation of Barnum’s property because the public will *905 perceive its land as subject to “additional and onerous regulation.”[3]
II. ANALYSIS
In order to satisfy the “irreducible constitutional minimum of standing,” a plaintiff must establish: (1) that it has suffered an “ ‘injury in fact’ — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;” (2) that the injury is “fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;” and (3) that it is “likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted).
I will examine each prong of the standing analysis to determine if Barnum possesses requisite standing to bring this suit.

II.A Injury in Fact

The majority opinion appropriately begins its analysis of standing on the first factor of the Lujan test, even though EPA concedes that this element is met. As “standing is a necessary element of federal-court jurisdiction!;,]” the Court must consider it to ensure that Barnum possesses constitutional standing. See Thomas v. Mundell, 572 F.3d 756, 760 (9th Cir.2009). The majority finds that this prong is satisfied because Barnum alleges that the value of its property decreased due to the listing of Redwood Creek’s in the Section 303(d) listing, saying that a “specific, concrete, and particularized allegation of a reduction in the value of property owned by the plaintiff is sufficient to demonstrate injury-in-fact at the pleading stage.” Majority at 898. However, this rule actually leads to exactly the opposite result.
Economic injury, such as a decrease in property value, is often a sufficient basis for standing. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); San Diego County Gun Rights Committee v. Reno, 98 F.3d 1121, 1130 (9th Cir.1996) (citing Central Ariz. Water Conservation Dist. v. EPA 990 F.2d 1531, 1537 (9th Cir.1993)). Nonetheless, a general averment that conduct may decrease property value is not sufficient where that harm is not yet concrete and remains speculative.
Here, under either theory of harm, any injury that Barnum may suffer related to its property value is highly speculative and would depend upon the occurrence of a long chain of future events, including: Redwood Creek remaining on California’s CWA Section 303(d) listing for temperature and sediment, California developing a temperature and sediment TMDL for Redwood Creek, California developing a TMDL that affects timber, and finally, California applying that plan in a manner that affects Barnum. If any of these eon *906 tingent events — these are only a few examples — does not occur, then there would be no reason for Barnum’s property value to fall.
As any injury alleged by Barnum is speculative and uncertain, I disagree with the majority that this prong of the standing inquiry is met. Barnum is unable to identify any particular conduct that plausibly caused a decrease in property value. Barnum is also unable to explain any decrease in value other than by vaguely pointing to market factors, and even then only positing what “the public perceives— whether accurately or not.” These allegations are not sufficient to satisfy the constitutional requirements of standing. See Whitmore v. Arkansas, 495 U.S. 149, 168, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (“Allegations of possible future injury do not satisfy the requirements of Article III”); Hells Canyon Preservation Council v. U.S. Forest Service, 593 F.3d 923, 930 (9th Cir.2010) (holding that plaintiffs lacked standing where the “precise injury” could not be identified); Louisiana Envt’l Action Network v. Browner, 87 F.3d 1379, 1382-84 (D.C.Cir.1996) (holding that plaintiffs lacked standing where injury depended upon a future chain of events). As such, I would affirm the district court’s ruling on this ground.

II.B Fairly Traceable

Although I disagree with the majority and find that the district court’s opinion should be affirmed because Barnum’s allegations do not meet the first prong of the test for standing, I proceed to the second prong: whether the alleged injury is “fairly traceable” to EPA’s conduct. Here, the majority opinion only analyzes Barnum’s second theory of harm — that the inclusion of Redwood Creek on the Section 303(d) listing will directly cause a decrease in property value — and concludes that this prong of the standing test is met. I also disagree with the majority on this prong of the standing inquiry. I will address both of Barnum’s theories of harm independently, since each is based on a distinct causation chain.

i. Section S0S(d) Listing as Trigger for California Forestry Regulations

The “fairly traceable” prong of Lujan’s standing test does not require that the defendant directly cause the plaintiffs injury or even that the defendant’s conduct be the last link in the chain of causation. Bennett v. Spear, 520 U.S. 154, 168-69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). However, an injury is not fairly traceable if the injury “results from the independent action of some third party not before the court.” Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In determining if the injury alleged is fairly traceable to EPA’s conduct, the Court must consider whether EPA’s action had some “determinative or coercive effect” upon the state of California that produced Barnum’s injury. Bennett, 520 U.S. at 169, 117 S.Ct. 1154.
The district court found that while California Forestry Regulation § 898 imposed requirements on Barnum, the injury was not fairly traceable to EPA’s actions because it required the independent intervening action of a third party, the state of California. The district court’s conclusion is correct.
In Bennett v. Spear, a group of ranchers and irrigation districts sued the Fish and Wildlife Service to invalidate a Biological Opinion that found a water project threatened species protected by the Endangered Species Act. 520 U.S. 154, 158-59, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The Court concluded that the injury was fairly traceable to the Fish and Wildlife Service because the Biological Opinion had a “pow *907 erful coercive effect on the action agency” since the statutory scheme presupposed that the Biological Opinion would play a central role in the action agency’s decision-making process, and action agencies very rarely choose to engage in conduct that the Service has concluded was likely to jeopardize an endangered species. Id. at 169, 117 S.Ct. 1154. The Court found that the Biological Opinion in Bennett had “direct and appreciable consequences.” Id. at 178, 117 S.Ct. 1154.
The current suit is distinguishable, because EPA’s Section 303(d) listing does not have a similarly “powerful coercive effect” upon California’s regulatory bodies. As previously described, while the CWA establishes procedures for the states to identify polluted waterbodies and to set water quality standards, the statutory scheme gives the states broad discretion in implementing their plans. Although Section 303(d) requires the California Water Boards to identify impaired waters and to establish total maximum daily loads, Section 303(d) does not direct or require the California Department of Forestry to enact or to enforce Section 898 or to use any specific means to accomplish the TMDL.
Moreover, and further undercutting Barnum’s position, Barnum’s injury is most directly traceable to California’s regulations, not EPA’s. California enjoys broad discretion to regulate Redwood Creek as it sees fit within the statutory scheme established by the CWA. EPA’s approval of the Section 303(d) listing has no “determinative or coercive effect” upon California’s enactment, implementation, or enforcement of its Forest Practice Rules. California independently chose to condition application of one of its Forest Practice regulations on Section 303(d) listing. But more importantly, California alone decides what, if any, restrictions to place upon Barnum’s operations.
Thus, I find that, under its first theory of harm, Barnum fails to meet the “fairly traceable” prong of the Lujan test as any alleged harm is caused not by EPA, but by the independent action of the state of California.

ii Section 303(d) Listing Directly Causing a Decrease in Property Value

The majority opinion analyzes Barnum’s second theory of harm, finding this prong of the standing inquiry is met because Barnum sufficiently sets forth a “causal connection” between the alleged injury-in-fact (decrease in property value) and EPA’s action.
I disagree. The majority concludes that Barnum’s bare allegation that EPA’s approval of California’s decision to include Redwood Creek in the Section 303(d) list is sufficient to establish causation. Although the majority seems to rely heavily upon two declarations submitted by Barnum in support of its motion for an amended complaint, neither of these declarations supplement Barnum’s allegations in any appreciable way. Rather, each simply repeats the allegation that EPA’s decision to approve California’s Section 303(d) listing caused a decrease in property value. Neither the proposed amended complaint nor the foresters’ affidavits addresses the fatal flaw in Barnum’s allegations. Although Barnum alleges that the Section 303(d) list directly caused a decrease in its property value, Barnum never actually asserts a plausible allegation that the decrease in property value is caused by the actions of EPA.[4]
*908 The majority spends several pages struggling to distinguish this court’s prior decision in San Diego County Gun Rights Committee v. Reno., 98 F.3d 1121. I disagree with that analysis and would rely upon San Diego County; I think that case is sufficiently related and should be seen as precedent.
First, similar to San Diego County, a multitude of factors affects Barnum’s alleged harm. At best, Barnum alleges that the listing by EPA is one factor, among many, that might affect the value of its property. Many factors, such as California state regulations, other federal regulations, market forces, or even natural events, affect the value of Barnum’s property. Specifically, timber harvesting in California is subject to numerous state regulations unrelated to the EPA listing. [See E.R. at 9 (“California’s forestry rules comprehensively regulate [Barnum’s] conduct irrespective of Redwood Creek’s Section 303(d) listing”) (citing Cal. Pub. Res. Code §§ 4581-82; Cal.Code Regs. tit. 14 §§ 897, 911-29).] Importantly, the factual setting is quite similar to that in San Diego County, where both federal and state statutes banned the manufacture, sale, and distribution of certain assault weapons. 98 F.3d at 1124. As in San Diego County, other factors much more directly affect the property value of this property. This uncertain impact weighs strongly against a finding that causation is met.
Second, and more importantly, in concluding that EPA listing sufficiently affects property values to meet the causation requirement, the majority opinion incorrectly characterizes the Section 303(d) listing as a “regulatory restriction[ ] on one property that affect[s] the uses to which a second property can be put.” Majority at 900. This description leads to the seemingly natural conclusion that the listing more directly affects the property value. However, this claim is simply not true — the listing does not impose any direct regulations. Any future regulations imposed on nonpoint sources of water pollution in Redwood Creek would be enacted, if at all, by the state of California, and not by EPA. Pronsolino, 291 F.3d at 1128-29. Any injury to Barnum would only occur should California establish a temperature or sediment TMDL for Redwood Creek and adopt that plan in a manner that affects Barnum’s property. The injury to Barnum, if any, would be traceable to California, rather than EPA.
Indeed, this circuit previously acknowledged that “the CWA leaves to the states the responsibility of developing plans to achieve water quality standards if the statutorily-mandated point source controls will not alone suffice, while providing federal funding to aid in the implementation of the state plans.” Id. “California [chooses] both if and how it would implement the [ ] TMDL. States must implement TMDLs only to the extent that they seek to avoid losing federal grant money; there is no pertinent statutory provision otherwise requiring implementation of § 303 plans or providing for their enforcement.” Id. at *909 1140[5]; see also Defenders of Wildlife v. EPA 415 F.3d 1121, 1124 (10th Cir.2005) (“Congress clearly intended the EPA to have a limited, non-rulemaking role in the establishment of water quality standards by states.”) (citation and internal quotation omitted); Sierra Club v. Meiburg, 296 F.3d 1021, 1026-27 (11th Cir.2002) (“Georgia has the primary authority and responsibility for issuing permits and controlling nonpoint source pollution in that state. It also has both the authority and the duty to compile the list of limited segments (the § 303(d) list), and establish TMDLs for each waterbody on the list.”).
A break of this magnitude in the causal chain would lead to the failure of a cause of action in the tort context, and it is also fatal here. See Lujan, 504 U.S. at 560, 112 S.Ct. 2130 (“injury must not be the result of the independent action of some third party not before the court”) (citations and internal quotations omitted); San Diego County, 98 F.3d at 1130 (holding that standing not met where harm is the result of independent third party not before the court).
The majority opinion seeks to distinguish San Diego County by stating that the plaintiffs in that case failed to demonstrate a causal connection because “they provided no evidence attesting that the federal government’s actions actually did cause an increase in the prices ...,” whereas here, Barnum alleges that the Section 303(d) listing directly caused a decrease in the property value of its property. Majority at 900. However, as explained, the current claim fails for the same reason. If the value of Barnum’s property actually decreases, it is not because of EPA’s conduct, but rather because the listing indicates that the property may be subject to California state environmental regulations. California, not EPA, enacts and enforces regulations related to nonpoint sources. Thus, any decrease in property value related to the Section 303(d) listing results from the possibility of future state, not past federal, action.
Therefore, as I find that neither of Barnum’s theories of harm established the requisite causal connection to show that the alleged injury is “fairly traceable” to the conduct of EPA, I would affirm the judgment of the district court on this ground.

II.C Redressability

I also consider redressability, the third prong of the standing analysis. Determining redressability “requires an analysis of whether the court has the power to right or to prevent the claimed injury.” Gonzales v. Gorsuch, 688 F.2d 1263, 1267 (9th Cir.1982). Again, the majority opinion analyzes Barnum’s second theory of harm— that the inclusion of Redwood Creek on the Section 303(d) listing will directly cause a decrease in property value — and concludes that this prong of the standing test is met. I disagree with the majority on this inquiry as well.

i. Section 303(d) Listing as Trigger for California Forestry Regulations

Barnum does not show a likelihood of redressability.[6] The mere fact that Sec *910 tion 898 refers to a Section 303(d) listing in one of its subsections does not itself show that the removal of Redwood Creek from the 303(d) list would likely redress Barnum’s claimed injury.
Barnum incorrectly claims that because the Section 303(d) listing triggers the application of Section 898 to Redwood Creek, EPA’s inclusion of Redwood Creek on the list is the “but for” cause of its injury. As described earlier, the CWA leaves the implementation of clean water regulations to the states’ discretion. California has implemented a comprehensive system of regulations for timber harvesters, which “comprehensively regulate [Barnum’s] conduct irrespective of Redwood Creek’s Section 303(d) listing.” Thus, though one state regulation is tied to the Section 303(d) listing, the California regulations in total would impose costs upon Barnum even if Redwood Creek is removed from the Section 303(d) list. Moreover, even if Redwood Creek is removed from the Section 303(d) list, Section 898 itself might cause California to require Barnum to consider measures to improve the water in the Redwood Creek watershed. See Cal. Code Regs, tit.14 § 898.
Accordingly, I believe that Barnum fails to show that its alleged injury would be redressable because California regulations would continue to impose costs potentially affecting property values near Redwood Creek.

ii. Section 803(d) Listing Directly Causing a Decrease in Property Value

The majority opinion’s analysis of standing’s third element concludes that Barnum’s alleged injury — a decrease in property value — could be redressed by a ruling favorable to Barnum. However, for many of the same reasons that Barnum’s argument fails to satisfy standing’s second prong, I find that Barnum fails to establish that its alleged injury could be redressed by a favorable ruling.
California continues to control the implementation of the land management practices in that state, and an order against EPA would not redress Barnum’s alleged injury. Indeed, California has not yet developed any specific TMDL that impacts Barnum. And, even if they are developed, California — not EPA — will decide how and if it will implement them. Pronsolino, 291 F.3d at 1140. As the district court noted, “at root, the injuries plaintiff alleges arise from California’s forestry regulations, and not [from] any action of the EPA.” See San Diego County, 98 F.3d at 1130; see also Levine v. Vilsack, 587 F.3d 986, 995 (9th Cir.2009) (holding alleged injury not redressable where it depended upon the conduct of a third party); Arakaki v. Lingle, 477 F.3d 1048, 1064 (9th Cir.2007) (holding that an injury is not redressable where the potential benefit of suit is speculative); Boating Industry Ass’n v. Marshall, 601 F.2d 1376, 1380 (9th Cir.1979) (“[I]f the injury stems not from the government action disputed, but from an independent source, a federal court cannot provide the plaintiff redress by directing the government to alter its action.”).
Accordingly, as I find that neither of Barnum’s theories of harm establish that the injury alleged can be redressed by the relief requested, I would also affirm the *911 judgment of the district court on this ground.
III. CONCLUSION
Because I would hold that Barnum does not possess requisite standing to meet the requirements of Article III, I would affirm the district court’s dismissal and respectfully dissent from the majority opinion.

. Section 303(e) requires each state to have a ''continuing planning process” which must include, inter alia, effluent limitations and schedules of compliance "at least as stringent as those required by [the Act],” TMDLs as required under Section 303(d), and procedures for revising and implementing water quality standards as required. 33 U.S.C. § 1313(e)(1), (3). Each state must submit its Section 303(e) plan to the EPA for approval. 33 U.S.C. § 1313(e)(2).

. These declarations lack any sufficient foundation. For example, Thomas Hermann describes experience with forestry management but gives no description of land value appraisal experience. He then acknowledges that “[ojther regulations and laws undoubtedly reduce the value of Barnum's property” but then gives the opinion that the 303(d) listing "will undoubtedly reduce the value of Barnum's property.” Hermann reaches this opinion against the admitted backdrop that any number of state regulations impacts the value of the Barnum property and that "[i]t is not feasible to isolate the precise incremental loss in value to Barnum's property caused by the Section 303(d) listing.” Hermann then justifies his opinion that the 303(d) listing diminishes the property values: "When a listing occurs, the public perceives-whether accurately or not-that the subject property will be subject to additional and onerous regulation.” Without any described polling regarding public perceptions and without any described experience in property appraisals, the majority opinion accepts Hermann's opinion without considering what training, education or experience qualifies him to say what "the public perceives.” Thus, as it is Barnum’s burden to provide "competent evidentiary support” for its jurisdictional averments, the Court may properly find that these unsupported affidavits are insufficient proof of standing. See, e.g., Thomson v. Gaskill, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942).

. This Court reviews a district court’s dismissal for lack of standing de novo. Rattlesnake Coalition v. EPA, 509 F.3d 1095, 1100 (9th Cir.2007). The Court reviews the district court's factual findings relevant to standing for clear error. Id. Where standing is raised in connection with a motion to dismiss, the court accepts as true all material factual allegations in the complaint. Levine v. Vilsack, 587 F.3d 986, 991 (9th Cir.2009).
The Court reviews a district court’s denial of leave to amend for abuse of discretion. United States v. SmithKline Beecham, Inc., 245 F.3d 1048, 1051 (9th Cir.2001). However, “whether such a denial rests on an inaccurate view of the law and is therefore an abuse of discretion, requires us to review the underlying legal determination de novo." Smith v. Pacific Properties and Development Corp., 358 F.3d 1097, 1100 (9th Cir.2004) (internal citations omitted).

. The majority opinion does not subject Barnum’s allegation that EPA listing caused the decrease in property value to any scrutiny, and instead accepts that allegation as proof of *908 causation. Majority at 898-99. However, Barnum's alleged injuries all stem from California’s actions, and not the actions of EPA. Barnum's allegation that the injury is connected to EPA — although that connection is pled in the complaint — is not at all plausible and cannot support constitutional standing. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear on the record.”) (internal quotation marks and citations omitted). Here there is no affirmative proof on the record that EPA listing caused the alleged decrease in property value.

. “California is free to select whatever, if any, land-management practices it feels will achieve the load reductions called for by the TMDL. California is also free to moderate or to modify the TMDL reductions, or even refuse to implement them, in light of countervailing state interests. Although such steps might provoke EPA to withhold federal environmental grant money, California is free to run the risk.” Pronsolino v. Marcus, 91 F.Supp.2d 1337, 1355 (N.D.Cal.2000), aff'd, 291 F.3d 1123 (9th Cir.2002).

. While EPA does not challenge the redressability requirement with respect to the Section *910 898 injury, this court may affirm the district court on any ground supported by the record. Levine v. Vilsack, 587 F.3d 986, 991 (9th Cir.2009). As the party seeking federal jurisdiction, Barnum bears the burden of showing that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan, 504 U.S. at 561, 112 S.Ct. 2130.